CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
OCT 3 0 2007
JOHN F. CORCORAN, CLERK
BY: /s/
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
LYNCHBURG DIVISION

RICHARD A. PLASTER,
         *Plaintiff*,

v.

DEPUTY SHERIFF R. T. BOSWELL, AND

DEPUTY SHERIFF J. D. GOYNE,
         *Defendants*.

CIVIL NO. 6:05CV00006

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

This matter is before the Court on the parties' cross-motions for summary judgment. In this 42 U.S.C. § 1983 action, Plaintiff, who is proceeding *pro se*, claims that Defendants violated his Second, Fourth, and Fourteenth Amendment rights by arresting him and seizing his firearms on warrants that were not supported by probable cause. Plaintiff claims that Defendants did this in retaliation for his assertion of his rights under the Fifth and Sixth Amendments. After reviewing the affidavits, deposition excerpts, and other evidence properly placed before the Court, I find that the two arrest warrants and the search warrant obtained by Defendants were supported by probable cause. In addition, I find that even if the warrants were not supported by probably cause, an objectively reasonable law enforcement officer could have believed that they were. Accordingly, Defendants are entitled to qualified immunity, and I will therefore grant their motion for summary judgment and deny Plaintiff's motion in an order to follow.

## BACKGROUND

Prior to the events that directly precipitated this case, the plaintiff, Richard Plaster, and John Ivory, his next-door neighbor, had been engaged in an ongoing feud for some time. It appears to have begun with a dispute over the boundary line between their properties. The

flames were then fanned by Plaintiff's alleged failure to consult Ivory before installing a gate in the "four-foot woven wire fence [with] a strand of barbed wire on top and an electronic fence on top of that" that Plaintiff had erected between his and Ivory's property. (Trial Tr. 105:22–24, Oct. 28, 2003.) There is also some suggestion that Ivory and his wife were put off by Plaintiff's fondness for hunting and firearms, and that Plaintiff was likewise put off by the Ivories' disdain for those things.

The feuding came to a head on March 18, 2003, when Ivory called 911 alleging that Plaintiff had shot at him and his wife. Defendant R.T. Boswell, backed up by fellow Bedford County Sherriff's Deputy James Kirkland, arrived on the scene and interviewed Mr. and Mrs. Ivory. They stated that Plaintiff had fired his shotgun at them from the area near the fence dividing their properties and that they were in fear for their lives. The deputies then went next door to Plaintiff's house and asked to speak with him about the Ivories' allegations. Plaintiff denied shooting at the Ivories but admitted that he had been using a shotgun to target shoot in his backyard. Plaintiff was initially cooperative with the deputies, taking them around to the back of the house to show them where he had been standing, the milk jug he had been shooting at, the spent shotgun shells, and the scuffmarks in the ground where the shotgun pellets had struck.

Although it is somewhat unclear what precipitated it, at some point Plaintiff ceased cooperating and invoked his Fifth Amendment right against self-incrimination and his Sixth Amendment right to counsel. Boswell, allegedly angered by Plaintiff's invocation of constitutional rights, responded with words to the effect of, "So it's the Fifth Amendment rights, is it?" (Plaster Dep. 66:6–7.) The deputies did not ask Plaintiff any further questions and went to interview other witnesses, including Greg and Joyce Whalen, neighbors who said they saw Plaintiff shooting at the milk jug. After they returned, the deputies spoke with Plaintiff's wife, and Boswell allegedly told Plaintiff that "the evidence show[ed] no crime ha[d] been

committed." (Plaster Dep. 71:13–14.) After leaving Plaintiff's house without making an arrest, the deputies told the Ivories that if they wanted to pursue an arrest warrant, they should take their complaint to the magistrate.

The Ivories did exactly that. At the magistrate's office, Mr. Ivory made a sworn criminal complaint in which he stated that Plaintiff fired three shots at him and his wife. The magistrate did not issue warrants at that time and told the Ivories they needed to speak with an officer.[1] The Ivories then proceeded to the Sheriff's Office, where they met with the other defendant in this case, Deputy J.D. Goyne. After the Ivories related to Goyne what had allegedly happened with Plaintiff earlier that day, repeating their claim that Plaintiff had fired at them three times, Goyne called Boswell, who at that time was off-duty, for more information on what had occurred.[2] After talking with Goyne, Boswell decided to return to the office to assist. Goyne also consulted with a Lieutenant Adams, who presumably was Goyne's superior, and Commonwealth's Attorney Randy Krantz.

That night, Boswell and Goyne appeared before the magistrate. Goyne obtained warrants for Plaintiff's arrest on felony charges of attempted malicious wounding, Va. Code § 18.2-51, and use of a firearm in an attempted malicious wounding, Va. Code § 18.2-53.1.[3] Boswell obtained a warrant to search Plaintiff's home for shotgun- and rifle-style weapons. Goyne, Boswell, and another deputy then went to Plaintiff's home. Plaintiff was placed under arrest, and

---

[1] According to Commonwealth's Attorney Randy Krantz, the magistrate was at that time already contemplating issuing felony warrants, but it appears that Krantz's only source for this information was Goyne. (*See* Krantz Dep. 53:13–19; Krantz Aff ¶ 2.) Krantz's statements in this regard would most likely be inadmissible hearsay at trial and therefore will not be considered on a motion for summary judgment.

[2] The only account in the record of what Boswell told Goyne in response is found in a hearsay statement of Krantz. (*See* Krantz Aff. ¶ 3.)

[3] Although the arrest warrants state that they are based on the sworn statements of Goyne, there is no record of the contents of these statements. In addition, it is undisputed that Ivory's sworn statement was also before the magistrate, but there is no reference to it in the warrants.

after he refused to produce the weapon involved, his home was searched and three shotguns and six rifles were seized.

A search of the Ivories' property the next day revealed no physical evidence to bolster their claims. In July 2003, after a preliminary hearing in the Bedford County Circuit Court, the charges against Plaintiff were dismissed. Three weeks later, a grand jury indicted Plaintiff on misdemeanor charges of assault, Va. Code § 18.2-57, and reckless handling of a firearm, Va. Code § 18.2-56.1, arising out of the same incident between Plaintiff and the Ivories. Following an October 2003 bench trial, the Circuit Court found Plaintiff not guilty of both charges.

In March 2005, Plaintiff brought this 42 U.S.C. §1983 action alleging that he was arrested and prosecuted because he exercised his Fifth and Sixth Amendment rights during the initial investigation of Ivory's complaint. Specifically, Plaintiff alleges that Boswell and Goyne, the only remaining defendants,[4] violated Plaintiff's Second, Fourth, and Fourteenth Amendment rights by arresting him and seizing his firearms without probable cause in retaliation for exercising his constitutional right against self-incrimination and right to counsel. Defendants moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff filed a memorandum in opposition, and then several months later filed his own motion for summary judgment. I heard oral argument on September 11, 2007.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "As to

---

[4] I dismissed the other two original defendants, Sheriff Mike Brown and Commonwealth's Attorney Randy Krantz, on February 1, 2006.

materiality . . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Moreover, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Furthermore, if the evidence of a genuine issue of material fact "is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 250. Summary judgment under Rule 56 is appropriate only when the court, viewing the record as a whole and drawing reasonable inferences in the light most favorable to the nonmoving party, determines that the Rule 56(c) standard has been met. *See, e.g., id.* at 248–50 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir.1999); *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994).

If the nonmoving party bears the burden of proof, "the burden on the moving party may be discharged by 'showing' ... an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325. If the moving party shows such an absence of evidence, the burden shifts to the nonmoving party to set forth specific facts illustrating genuine issues for trial. *See* Fed. R. Civ. P. 56(e); *Celotex,* 477 U.S. at 324.

A court must grant a motion for summary judgment if, after adequate time for discovery, the nonmoving party fails to make a showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. The nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but ... [must] by affidavits or as otherwise provided in ... [Rule 56] set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Indeed, the nonmoving party cannot defeat a properly supported motion for summary judgment with mere conjecture and speculation. *Glover v. Oppleman*, 178 F. Supp. 2d 622, 631

(W.D. Va. 2001) ("Mere speculation by the non-movant cannot create a genuine issue of material fact."). The trial judge has an "affirmative obligation" to "prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 317).

## DISCUSSION

All of Plaintiff's claims turn on the alleged Fourth Amendment violations. If the arrest of Plaintiff, the search of his home, and the seizure of his firearms were valid, then there can be no legitimate claim that his Second Amendment rights were violated or that Defendants acted in retaliation for his assertion of his Fifth and Sixth Amendment rights. Even if Plaintiff's Fourth Amendment rights were violated, however, Defendants may still be shielded from liability by qualified immunity. The qualified immunity inquiry thus proceeds in two parts, both of which are issues of law to be decided by the court. *Pittman v. Nelms*, 87 F.3d 116, 119 (4th Cir. 1996). First, a court must ask, "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the court answers in the affirmative, it then proceeds to the next step, which "ask[s] whether the right asserted was clearly established" at the time of the violation. *Id.* In the Fourth Circuit, a court "conduct[s] this latter inquiry by determining whether a reasonable officer would have understood that his conduct violated the asserted right." *Miller v. Prince George's County, Md.*, 475 F.3d 621, 627 (4th Cir. 2007) (citing *Saucier*, 533 U.S. at 202). "The answer to both *Saucier* questions must be in the affirmative for a plaintiff to defeat a defendant police officer's motion for summary judgment on qualified immunity grounds."[5] *Clem v. Corbeau*, 284 F.3d 543, 549 (4th Cir. 2002).

---

[5] Issues of qualified immunity can and, where possible, should be decided on summary judgment. *See Pittman*,

- 6 -

The first step of the qualified immunity analysis, whether the arrest of Plaintiff and the search of his home violated a constitutional right, turns on whether the warrants were supported by probable cause. *See McKinney v. Richland County Sherriff's Dep't*, 431 F.3d 415, 418 (4th Cir. 2005) ("[W]e conclude that the first arrest warrant was based on probable cause and that McKinney thus suffered no violation of his constitutional rights.") There can be little question that probable cause to arrest Plaintiff existed immediately after the Ivories spoke with Boswell; they clearly identified Plaintiff as having shot at them and there is nothing to suggest that their statements, standing alone, were not credible.[6] *See id.* (citing *Torchinsky v. Siwinski*, 942 F.2d 257, 262 (4th Cir. 1991)); *United States v. Beckham*, 325 F. Supp. 3d 678, 687 (E.D. Va. 2004) (citing numerous cases for "the principle that a finding of probable cause may be based on information provided by a victim or eyewitness to a crime");[7] *see also Wilson v. Russo*, 212 F.3d 781, 790 (3d Cir. 2000) ("[W]e agree that a positive identification by a victim witness, without

---

87 F.3d at 119 (explaining that policy considerations "favor deciding qualified immunity at the summary judgment stage"); *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991) ("[A] particularly appropriate procedure for determining an official's entitlement to qualified immunity is summary judgment."); *see also Curley v. Klem*, 499 F.3d 199, 211 (3d Cir. 2007) ("[W]hether an officer made a reasonable mistake of law and is thus entitled to qualified immunity is a question of law that is properly answered by the court, not a jury.").

[6] To the extent that Defendants had probable cause to arrest Plaintiff in relation to a shooting, they also had probable cause for obtaining a warrant to search Plaintiff's home for the weapon used. *See U.S. v. Suarez*, 906 F.2d 977, 984 (4th Cir. 1990) ("Probable cause to search exists when, at the time the magistrate issues the warrant, there are reasonably trustworthy facts which, given the totality of the circumstances, are sufficient to lead a prudent person to believe that the items sought constitute fruits, instrumentalities, or evidence of crime and will be present at the time and place of the search."). Plaintiff's claim that the search warrant was overbroad by its inclusion of "rifle-style" firearms in addition to shotguns is unavailing. In his memorandum in opposition, Plaintiff states that Boswell "knew it was an 870 Remington pump shotgun" and cites to his Exhibit 8 in support. (Pl.'s Opp. Mot. Summ J. 3.) Exhibit 8, however, is an unauthenticated copy of a page from the Assistant Commonwealth Attorney's handwritten notes. (*Id.* at Ex. 8.) The source of the information in the notes is unclear, and they are undated. (*Id.*) The note Plaintiff is presumably referring to is written in the margin and states "Remington 870 fire multiple rounds; [Plaintiff] never said which one." (*Id.*) Even if this evidence were admissible, which it is not, no reasonable juror could reach the conclusion that it proves Boswell "knew it was an 870 Remington pump shotgun." Moreover, it is undisputed that the Ivories were less than familiar with firearms, and their trial testimony suggests that Boswell would have been justified in questioning whether they had correctly identified the weapon allegedly used by Plaintiff as a shotgun as opposed to a rifle. (*See* Trial Tr. 17, 25–26, 55, Oct. 28, 2003.) The reasonableness of Boswell's action is further supported by the fact that his warrant affidavit did not ask to search for handguns, which would have been clearly inconsistent with the Ivories statements. (Aff. Search Warrant ¶ 3.)

[7] Elsewhere in its opinion, the court in *Beckham* added that "when a victim reports a crime immediately after its occurrence and then points to an individual and exclaims, 'he's right there!,' . . . a reasonable and prudent police officer would naturally tend to believe that the identified suspect has committed the alleged offense." *Beckham*, 325 F. Supp. 3d at 688.

more, would usually be sufficient to establish probable cause."); *Ahlers v. Schebil,* 188 F.3d 365 (6th Cir. 1999) ("An eyewitness identification will constitute sufficient probable cause 'unless . . . there is an apparent reason for the officer to [dis]believe . . . the eyewitness.'"); *Kuehl v. Burtis,* 173 F.3d 646, 649–650 (8th Cir. 1999) ("[A]n officer may make an arrest if a credible eyewitness claims to have seen the suspect commit the crime."); *Spiegel v. Cortese,* 196 F.3d 717, 724 (7th Cir.1999) ("[I]t is well-established that [w]hen an officer has received . . . information from some person—normally the putative victim or an eye witness—who it seems reasonable to believe is telling the truth, he has probable cause." (internal quotation marks omitted)); *Sharrar v. Felsing,* 128 F.3d 810, 818 (3d Cir. 1997) ("When a police officer has received a reliable identification by a victim of his or her attacker, the police have probable cause.").

Although Boswell could have properly sought warrants at that point, he prudently chose to investigate further. As Plaintiff has correctly emphasized, the probable cause determination must be based on the "totality of the circumstances." *United States v. Humphries,* 372 F.3d 653, 657–58 (4th Cir. 2004); *see also Wadkins v. Arnold,* 214 F.3d 535, 543 (4th Cir. 2000) ("[A]n officer may not disregard readily available exculpatory evidence of which he is aware."). The question, then, is whether any information subsequently obtained by Defendants was sufficient to negate the probable cause created by the Ivories' eyewitness identifications. As reflected in the record placed before the Court, the deputies were aware of the following evidence at the time they obtained warrants from the magistrate:

- The Ivories' Statements. These included their statements to Boswell at the scene, their statements to Goyne at the Sheriff's Office, and Mr. Ivory's sworn written statement before the magistrate (Trial Tr. 44, 66–67, Oct. 28, 2003). In each, the

Ivories stated that Plaintiff shot at them, and nothing in the record suggests that there was any significant inconsistency between their statements.

- Plaintiff's Denial. When Boswell interviewed him, Plaintiff denied shooting at the Ivories and even denied having been near the fence where the Ivories claimed he shot at them from. In addition, Plaintiff showed Boswell the empty shotgun shells, the milk jug, and so forth. Although Plaintiff's version of events certainly seems plausible, and may well correctly describe what actually happened, law enforcement officers are "under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause." *Criss v. City of Kent*, 867 F.2d 259, 263 (6th Cir. 1988); *see also Spiegel*, 196 F.3d at 724 ("Many putative defendants protest their innocence, and it is not the responsibility of law enforcement officials to test such claims once probable cause has been established.").

- The Whalens' Statements. Assuming that the Whalens' statements to Boswell were consistent with their trial testimony, they would have told him that they were in their backyard during the entire time that they heard shots being fired and that from there they witnessed Plaintiff shooting at a milk jug, which certainly tends to support Plaintiff's version of events. (Trial Tr. 80–93, Oct. 28, 2003.) Boswell would also have learned, however, that (1) the Whalens are good friends with Plaintiff and his wife (*Id.* at 84–85, 92); (2) the Whalens were in their backyard to inspect the progress of a deck that they were having built, and their attention was therefore not necessarily focused on Plaintiff (*Id.* at 82, 90–91); (3) the Whalens' house is two doors down and 150–200 yards away from Plaintiff's house (*Id.* at 84, 89–90); and (4) the Whalens

have no view of the side of Plaintiff's yard from which the Ivories claimed he shot at them (*Id.* at 88, 93).

- The Bad Blood Between Neighbors. It appears from the evidence that both the Ivories and Plaintiff's wife alerted Boswell to the ongoing feud between the neighbors. This evidence, however, cuts both ways; it could provide motive for the Ivories to lie, but it could also provide motive for Plaintiff to shoot at them.[8]

Plaintiff argues throughout his filings, and he repeated at oral argument, that the evidence shows not only an absence of probable cause, but also conclusive proof of Plaintiff's innocence. However, as the discussion above shows, Plaintiff is simply incorrect. Indeed, the evidence available to Defendants was anything but conclusive.

Moreover, although the question of probable cause is a closer one when the inculpatory evidence is weighed against the exculpatory evidence, I cannot say that the exculpatory evidence was sufficient to negate the probable cause created by the Ivories' statements to Boswell, particularly after those statements were bolstered by the Ivories' further statements to Goyne and

---

[8] In addition to the evidence listed above, Plaintiff asserts—for the first time— in his motion for summary judgment that the Ivories told Boswell that after Plaintiff shot at them, they watched from their door as Plaintiff shot at the milk jug. (Pl.'s Mot. Summ. J. 10–11.) Plaintiff suggests that this should have undermined their credibility because Boswell knew that it would have been physically impossible for them to have seen him shooting in his backyard from that door. (*Id.* at 10–12.) Plaintiff offers, however, no evidence in support of his assertion that the Ivories so stated. Furthermore, the only evidence Plaintiff offers in support of his impossibility argument is two unauthenticated photographs and an unauthenticated diagram of the scene of the alleged crime. (*Id.* at Ex. 4–5.) In short, whether or not Plaintiff's assertion is accurate—and I do find it curious that Plaintiff's attorney in his criminal case did not attempt to impeach the Ivories on this point—Plaintiff has offered no admissible evidence in support of it, and I therefore cannot consider it on a Rule 56 motion for summary judgment.

Moreover, this is only the most significant of the many unsupported assertions of fact that Plaintiff makes in his motion for summary judgment. Whether or not Plaintiff's assertions are true, they must be supported by evidence that would be admissible at trial if they are to survive summary judgment, and unsworn allegations made in a memorandum filed with the Court do not satisfy that standard. *See* Fed. R. Civ. P. 56(c), (e); 11 *Moore's Federal Practice* § 56.13 ("The party opposing summary judgment has an affirmative duty to direct the court's attention to those specific portions of the record on which the party relies to create a genuine issue of material fact. . . . [E]ven references to specific provisions in the pleading are insufficient to create a material issue of fact.")

Plaintiff also expends considerable effort arguing that incidents subsequent to his arrest, such as his claim that Goyne lied to the grand jury in procuring the misdemeanor indictments, tend to show his innocence. These post-arrest events, however, are irrelevant to the issues of probable cause and qualified immunity because they shed no light on what Defendants knew at the time of they obtained the warrants. *See Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (stating that the probable cause inquiry "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer *at the time of the arrest*" (emphasis added)).

Mr. Ivory's sworn statement before the Magistrate. Although the evidence provided by Plaintiff and the Whalens would undoubtedly have raised some question as to Plaintiff's guilt and suggests that further investigation might have yielded greater clarity, the probable cause standard does not require a certainty of guilt, *see United States v. Williams*, 10 F.3d 1070, 1074 (4th Cir. 1993), nor does "a failure to pursue potentially exculpatory leads . . . negate probable cause," *McKinney*, 431 F.3d at 419 (citing *Wadkins*, 214 F.3d at 541).

Plaintiff makes much of his many claims to the effect that Boswell "advised [Plaintiff] and [his] wife that [Boswell's] investigation *proved* no crime had been committed." (Pl.'s Mot. Summ. J. 11 (emphasis added).) Whether Boswell actually went so far is questionable—even in Plaintiff's own deposition he states only that Boswell said, "Look, you know, the evidence shows no crime has been committed" (Plaster Dep. 71:13–14), and there is absolutely no evidence that Boswell ever made any such statement to Goyne. Moreover, even if Boswell did make such a concrete assertion, the evidence in the record shows that his investigation in fact did not "prove" that no crime had been committed, and there is no law preventing Boswell from later reconsidering. Most importantly, however, "[the Supreme Court's] cases make clear that an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause." *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (citations omitted); *see also Sevigny v. Dicksey*, 846 F.2d 953, 958 (4th Cir. 1988) ("The inquiry is whether, under the circumstances confronted, probable cause to arrest for some offense existed, or appeared reasonably to exist, without regard to the arresting officer's subjective perceptions of either fact or law.") Accordingly, because probable cause actually existed, Defendants are entitled to qualified immunity regardless of whether or not they were aware of the probable cause.

Because I find that the arrest and search warrants were supported by probable cause, I need not proceed to the second step of the qualified immunity analysis. However, even if I were

to conclude that the warrants were not supported by probable cause, Defendants "would nonetheless be entitled to qualified immunity because the absence of probable cause would not have been evident to an objectively reasonable officer in these circumstances." *McKinney*, 431 F.3d at 419.

"[L]aw enforcement officers are entitled to qualified immunity if they arrest a suspect under the mistaken belief that they have probable cause to do so—provided that the mistake is objectively reasonable. Stated otherwise, 'The issue for immunity purposes is not probable cause in fact but arguable probable cause.'" *Kuehl v. Burtis*, 173 F.3d 646, 649–650 (8th Cir. 1999) (citations omitted); *see also Floyd v. Farrell*, 765 F.2d 1, 5 (1st Cir. 1985) ("[S]eeking an arrest warrant is 'objectively reasonable' so long as the presence of probable cause is at least arguable. An officer will be held liable for seeking an arrest warrant later found to be without probable cause only if there *clearly* was no probable cause at the time the warrant was requested."); *Martin v. Mendoza*, 230 F.Supp.2d 665, 671 (D. Md. 2002) ("[E]ven if it is assumed that the existence of probable cause to arrest for disorderly conduct is a 'close call' on the present record, this is exactly the point of the qualified immunity defense."). As previously discussed, the issue of probable cause in this case is a "close call," and it is therefore at least "arguable" that the warrants were supported by probable cause.

Furthermore, although not conclusive of the issue, the reasonableness of Defendants' actions is also supported by the fact that they sought warrants at all. As the Fourth Circuit stated in *Torchinsky*:

> When a police officer protects a suspect's rights by obtaining a warrant from a neutral magistrate, the officer should, in turn, receive some protection from suit under 42 U.S.C. § 1983. Otherwise, the threat of liability would force officers to continuously second-guess the considered decisions of magistrates. . . . In our view then, [the officer's] actions in seeking the arrest warrants and the magistrate's determination of probable cause provide additional support for his claim that he acted with objective reasonableness.

Case 6:05-cv-00006-NKM-mfu   Document 85   Filed 10/30/07   Page 12 of 15   Pageid#: 429

*Torchinsky*, 942 F.2d at 262.

Like the plaintiffs in *Torchinsky*, Plaintiff argues that Defendants "cannot rely on the magistrate's probable cause determination because [they] allegedly omitted relevant information from [their] warrant applications," namely the exculpatory evidence offered by Plaintiff and the Whalens. *Id.* Although there is no record of Goyne's sworn statements on which the arrest warrants were based, it is true that Boswell's affidavit for a search warrant omits any mention of the information given by Plaintiff and the Whalens.[9] (Aff. Search Warrant ¶ 4.) But as the Fourth Circuit explained in *Miller*, there is no constitutional violation unless the omissions were both "material" and made with "reckless disregard" of whether they made the warrant affidavit misleading. *See Miller*, 475 F.3d at 627–28. For omissions to be material, they must be "necessary to the [neutral and disinterested magistrate's] finding of probable cause." *Id.* at 628 (alteration in original) (quoting *Franks v. Delaware*, 438 U.S. 155–56 (1978)). "'[R]eckless disregard' can be established by evidence that a police officer 'failed to inform the judicial officer of facts [he] knew would negate probable cause.'" *Id.* at 627 (quoting *Beauchamp v. City of Noblesville, Inc.*, 320 F.3d 733, 743 (7th Cir. 2003)). As previously discussed, even when the exculpatory evidence is accounted for, there was still probable cause to arrest Plaintiff and search

---

[9] Plaintiff pursued this issue in his deposition of Boswell:

> A: I felt that I had sufficient probable cause to apply for a search warrant.
> Q: Based on probable cause? Is it based upon what you choose to reveal, or is probable cause based upon the totality of the facts and circumstances known to you at the time that you applied for the warrant?
> A: I gave the magistrate all of the information that I had in reference to that, applied for the search warrant on the search warrant affidavit, and it was issued.
> Q: And you told him about my denial and the Whalens?

(Boswell Dep. 30:13–24.) Frustratingly, the page ends there, and neither party has provided the Court with the next page of the deposition transcript in which Boswell presumably responds to Plaintiff's query. Although by no means conclusive, Boswell's statements on the provided transcript page suggest that he may have orally given information to the magistrate that was not set forth in the affidavit.

his home. Accordingly, Boswell's omissions in the search warrant affidavit were neither material nor made with reckless disregard.

Finally, as in *Torchinsky*, "[i]t is noteworthy that two different judicial officers in separate proceedings determined that [Defendants] had demonstrated probable cause." *Torchinsky*, 942 F.3d at 261. Not only did the magistrate agree that there was probable cause, so did the Bedford County Circuit Court judge who presided over Plaintiff's criminal trial. (Trial Tr. 21–30, Oct. 7, 2003 (denying motion to suppress the fruits of the search based on a lack of probable cause).) In *Torchinsky*, the court stated that "the decision of a detached [federal] district judge that [the officer] satisfied the more stringent probable cause standard is plainly relevant to a showing that he met the lower standard of objective reasonableness required for qualified immunity." *Torchinsky*, 942 F.3d at 261. The decision of a state circuit court judge is, of course, entitled to equal respect, and here, after the issue was fully argued by both sides, the judge made a thoughtful, reasoned determination that, although Boswell's was a "bare-bones" affidavit, there was "sufficient evidence of probable cause." (Trial Tr. 29:3–6, Oct. 7, 2003.)

The judge's denial of a motion to strike the evidence (the Virginia equivalent of a motion for a judgment of acquittal) at the conclusion of the prosecution's case is also relevant here. (*See* Trial Tr. 74–75, Oct. 28, 2003.) At the criminal trial, the prosecution's only witnesses were the Ivories. In denying the motion to strike the evidence, the judge was effectively indicating that the prosecution had presented sufficient evidence for the trial to go forward. The fact that the inculpatory evidence of probable cause was based on the consistent statements of these same witnesses is therefore strongly suggestive of Defendants' objective reasonableness in believing that there was probable cause.

## CONCLUSION

Based upon the evidence properly placed before the Court as to the totality of the circumstances known to Defendants at the time, I find that the warrants to arrest Plaintiff and search his home were supported by probable cause. Accordingly, Defendants are entitled to qualified immunity and Plaintiff's claims must fail. Furthermore, even if I assume for the sake of argument that probable cause was lacking, Defendants are still entitled to qualified immunity because I find that an objectively reasonable law enforcement officer could have believed that there was probable cause under the circumstances. Accordingly, I will grant Defendants' Motion for Summary Judgment and deny Plaintiff's Motion for Summary Judgment in an order to follow.

The Clerk of the Court is hereby directed to send a certified copy of this Memorandum Opinion to all counsel of record.

ENTERED: _/s/_ 
United States District Judge

October 30, 2007
Date